**UNITED STATES DISTRICT COURT**
**DISTRICT OF THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Texas Low Income Housing Information Service, | |
| Plaintiff, | |
| v. | Civ. Action No. 1:18-cv-00644 |
| Ben Carson, Secretary of Housing and Urban Development, in his official capacity, 451 7th Street SW, Washington, DC 20410, | **COMPLAINT** |
| and | |
| U.S. Department of Housing and Urban Development, 451 7th Street SW, Washington, DC 20410, | |
| Defendants. | |

## INTRODUCTION

1.       This suit challenges the prolonged, programmatic failure of the U.S. Department of Housing and Urban Development (HUD) to enforce federal civil rights obligations against the City of Houston, Texas (Houston), contrary to meaningful standards established by statute and regulation. HUD fails to require Houston to conform its conduct to civil rights laws, including with respect to the placement of affordable housing. As a result, Houston remains the most racially segregated city in Texas, and one of the most segregated large cities in the country, while administering more than $30 million annually in HUD funding in a fashion that exacerbates and perpetuates segregation. Houston also regularly receives federal funding for flood relief, even as it maintains entirely different (and markedly inferior) drainage systems in predominantly minority neighborhoods, exposing the residents of those neighborhoods to increased risk from storms.

HUD knows that Houston discriminates on the basis of race—it even has made a finding that Houston capitulates to racist attitudes in deciding where to site affordable housing—and yet it refuses to act.

2.      Plaintiff Texas Low Income Housing Information Service (Texas Housers), a statewide non-profit organization, has been required to divert its scarce resources away from advocacy for low-income Texans in other regions of the state to document and repeatedly challenge HUD's failure to abide by its own civil rights obligations with respect to Houston. It brings this action under the Administrative Procedure Act (APA) to compel HUD to enforce federal civil rights laws and refrain from its prolonged course of conduct.

3.      HUD has—for nearly a decade—refused to meet its statutory and regulatory obligations to ensure that Houston complies with Title VI of the Civil Rights Act of 1964 (Title VI) and with the Fair Housing Act's obligation to affirmatively further fair housing (AFFH) as a precondition to disbursing federal funding. Those laws and their implementing regulations require HUD—in its funding and oversight of its funding recipients—to ensure that HUD's own actions, and its own distribution of federal funds, do not encourage or ratify discrimination or segregation by those recipients. In particular, HUD is required to address profound residential segregation when prior efforts have been unsuccessful or where no efforts have been made. Yet it now is clear that HUD has no intention of doing so with respect to Houston, no matter the evidence before it of Houston's non-compliance. On the rare occasions that HUD has formally determined that Houston was noncompliant with Title VI or AFFH, HUD has effectively given Houston a pass, and permitted it to continue its discriminatory policies and practices.

4.      Since at least 2011, HUD has unlawfully withheld and unreasonably delayed action or has taken action that is arbitrary, capricious, and an abuse of discretion, because it has

failed to consider the effect of its continued funding of Houston on the racial and socio-economic composition of Houston's neighborhoods and on the families of color who live in them. In short, HUD has failed to "assess negatively those aspects of a proposed course of action that would further limit the supply of genuinely open housing and to assess positively those aspects of a proposed course of action that would increase that supply." *NAACP v. HUD*, 817 F.2d 149, 156 (1st Cir. 1987).

5.      Two examples in recent years exemplify the egregiousness of HUD's failure to ensure compliance with the statutory and regulatory civil rights obligations that must guide its actions:

6.      **<u>First</u>**, HUD blatantly has declined to take meaningful action with respect to Houston's refusal to permit affordable housing complexes in predominantly white neighborhoods even as the City permits such developments in predominantly minority neighborhoods. There is no question that Houston has thereby violated Title VI and has procedures in place that risk continued such violations—HUD itself has so found. Yet, HUD has chosen not to require Houston to change this discriminatory course of conduct.

7.      In 2016, Houston blocked Fountain View Apartments, an affordable housing complex that was to be built in a majority-white, high opportunity area in Houston. HUD itself made a final determination on January 11, 2017 (Title VI Letter), after investigation, that Houston had violated Title VI and its implementing regulations and had permitted its affordable housing approval process to be "influenced by racially motivated opposition to affordable housing and [to] perpetuate segregation." A true and accurate copy of the Title VI Letter is attached as Exhibit 1. The final determination also found that "[t]he City has an established pattern of failing to site or support affordable housing projects in predominately white neighborhoods." Ex. 1, at 2.

8.     The following map shows the patterns of racial segregation in Houston, the proposed site for Fountain View Apartments, and the sites of public housing. This map was provided to HUD as part of its Title VI investigation. It paints a stark and undeniable picture: Houston has not permitted *any* public housing to be built in majority-white neighborhoods, with the Fountain View Apartments incident being just the latest example.

## Public Housing: Houston Housing Authority

Source: HHA, TNRIS, City of Houston, ACS 2009-2013, The Reinvestment Fund





9.     Houston took no steps to remedy the violations identified in the Title VI Letter. Yet, on March 9, 2018, HUD announced that it had entered into a voluntary compliance agreement (VCA) with Houston, which purportedly resolved the outstanding violations. A true and accurate copy of the VCA is attached as Exhibit 2. However, the VCA sets out four so-called

4

remedial actions by Houston that neither address the strong and conclusive evidence of Houston's Title VI violations (as established in the Title VI Letter), nor resolve those violations. Thus, despite clear evidence that Houston has made inaccurate civil rights compliance certifications in exchange for HUD funding in the past, and despite federal regulations governing the rejection of such inaccurate certifications, subsequent to the January 2017 letter, HUD, once more, has accepted those certifications and approved funding contracts and, once again, has been disbursing federal funding to Houston.

10.     This VCA makes clear that HUD has no intention of requiring Houston to comply with federal law as a condition of receiving federal funds. To the contrary, in the VCA, HUD reveals that it intends to grant Houston a "significant increase" in funding, including "disaster recovery funding related to Hurricane Harvey." Such an increased grant of funding—to an entity that HUD knows not to be in compliance with Title VI and AFFH requirements—is tantamount to HUD rejecting its own obligation to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further" the Fair Housing Act. 42 U.S.C. § 3608(e)(5).

11.     **<u>Second</u>**, Houston has failed to address the water drainage needs of most of Houston's racially- and ethnically-segregated neighborhoods, thereby subjecting them to repeated and prolonged flooding in the wake of hurricanes, tropical storms, and other natural disasters. While predominantly white neighborhoods receive more modern water drainage, in many predominantly minority neighborhoods, Houston provides only unimproved ditch drainage. Since at least October 2014, HUD has been aware of this disparity in how Houston treats predominantly white and minority neighborhoods.

12.     Notwithstanding that knowledge—which derives from the lengthy comments, data analysis, and mapping provided by Texas Housers and a study conducted by Houston itself, as well as a Title VI administrative complaint submitted to HUD on October 31, 2017—HUD has taken no actions to enforce Title VI obligations on Houston to ensure that its infrastructure and drainage program is administered in a non-discriminatory manner. It has failed to respond at all to Texas Housers' October 2017 complaint. It is now clear that HUD no more intends to address this violation than it does any other of Houston's failures to comply with Title VI or AFFH obligations.

13.     HUD's refusal to act on Houston's long-standing and repeated violations of law has damaged and continues to damage Plaintiff Texas Housers. Founded in 1988, Plaintiff's mission is to "support low-income Texans' efforts to achieve the American dream of a decent, affordable home in a quality neighborhood."

14.     Over the past decade, Texas Housers has had to curtail its activities related to many of these efforts and divert its scarce resources to overcome the effects of Houston's discriminatory and segregative housing policies and HUD's failure or refusal to enforce Houston's civil rights obligations. In addition, that failure or refusal has undermined Plaintiff's ability to accomplish its mission in Houston.

15.     Plaintiff has, over the past decade, devoted substantial resources to engaging in advocacy with Houston and requesting HUD's help in achieving integrated housing in Houston.

16.     Having been wrongly deprived of HUD's enforcement to require Houston to comply with its federal civil rights obligations, Texas Housers now seeks judicial intervention to obtain that assistance. The allegations contained herein demonstrate HUD's pattern of failing to comply with statutory requirements to affirmatively further fair housing codified at 42 U.S.C. §

3608(e)(5). HUD has refused to use its immense leverage under federal funding programs to ensure adequate desegregated housing in Houston. It has permitted Houston to acquiesce to racially-motivated opposition to the placement of affordable rental housing for families of color in high-opportunity, less racially concentrated areas. And it has permitted Houston to maintain inferior drainage systems in predominantly minority neighborhoods.

17.     Plaintiff seeks a straightforward evaluation of whether HUD's actions in continuing to fund Houston and its failure to enforce Houston's civil rights obligations have comported with the statutory goals embedded in the Title VI and the AFFH provisions of the Fair Housing Act and their implementing regulations, and a judicial determination that HUD's explanation for withholding such enforcement action is unsatisfactory.

18.     This Court is empowered, under the APA, to determine whether HUD has acted in compliance with that obligation and whether HUD has articulated a satisfactory explanation for its actions. If the Court determines that HUD has not, it may set aside HUD's practice of ignoring those obligations as an abuse of HUD's discretion and as arbitrary or capricious agency action. *See Jones v. O.C.C.*, 983 F. Supp. 197, 203-04 (D.D.C. 1997).

## Statutory and Regulatory Framework

19.     Title VI of the Civil Rights Act of 1964 prohibits race discrimination in federally-financed programs, 42 U.S.C. § 2000d, and empowers HUD to suspend or terminate funding to a recipient where HUD has made "an express finding on the record . . . of a failure to comply with [the non-discrimination requirements of Title VI]." *Id.*

20.     Among other statutory mandates, HUD is required to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of [the Fair Housing Act]." 42 U.S.C. § 3608(e)(5).

21.     The Housing and Community Development Act of 1974, as amended, provides that HUD can grant Community Development Block Grant (CDBG) funds "*only if* the grantee certifies to the satisfaction of the Secretary that . . . the grant will be conducted and administered in conformity with the Civil Rights Act of 1964 [42 U.S.C. 2000a *et seq.*] and the Fair Housing Act [42 U.S.C. 3601 *et seq.*], and the grantee will affirmatively further fair housing." 42 U.S.C. § 5304(b)(2) (emphasis supplied).

22.     On January 11, 2017, HUD itself found that Houston was in violation of Title VI. For the period beginning on January 11, 2017 and continuing until the present, Houston's certification that it was in compliance with Title VI was, *per se*, inaccurate and should have been rejected by HUD as unsatisfactory to the Secretary.

23.     Congress has authorized a number of federal funding programs—administered by HUD—to address the housing and community development needs of states, cities, and urban counties. By virtue of its population size and housing needs, Houston has been deemed eligible for four such programs: CDBG; HOME Investment Partnership (HOME); Emergency Solutions Grant (ESG); and Housing Opportunities for People with AIDS (HOPWA) (collectively, the Block Grant programs).

24.     In order to receive Block Grant funds, Houston must prepare and submit certain reports and certifications to HUD on an annual basis. Among these is an Annual Action Plan (which contains an annual Application for Federal Financial Assistance for each program, and certifications of compliance with Title VI and AFFH) and a Consolidated Annual Performance and Evaluation Report (CAPER). An Annual Action Plan describes proposed actions in the forthcoming year. A CAPER describes actual actions taken in the previous year. Since 1995,

Houston has also been obligated to produce a Consolidated Plan every five years, as well as an Analysis of Impediments to Fair Housing Choice (AI).

25.     Based on its HUD Program Year commencing on July 1, federal regulations require Houston to submit its Annual Action Plan on or before May 15 of each year and its CAPER on or before August 15 of each year.

26.     Federal statutes and regulations governing the Block Grant programs expressly condition funding on civil rights certifications. As a result, HUD cannot conclude that Houston is eligible for funding at a time when it knows that Houston's certifications that it complies with Title VI and the obligation to AFFH are demonstrably false. *See* 42 U.S.C. §§ 5304(b), 12872; 24 C.F.R. §§ 91.225, 91.500(b), 570.304, 570.601, 570.602, 570.900, 570.904. HUD's AFFH regulations "unambiguously impose mandatory requirements on the [recipients] not only to *certify* their compliance, but actually *to comply.*" *Langlois v. Abington Housing Authority*, 234 F.Supp.2d 33, 75 (D. Mass. 2002) (emphasis in the original).

27.     From 1995 through 2015, HUD regulations specified that Houston's AFFH certification imposed an obligation that Houston "conduct an analysis to identify impediments to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting the analysis and actions in this regard." 24 C.F.R. § 91.225 (2014).

28.     HUD promulgated a new AFFH regulation in 2015, requiring that Houston (and other affected jurisdictions) complete an Assessment of Fair Housing (AFH) in place of the former requirement for an AI. Pursuant to the new regulation—which became effective August 17, 2015—Houston's AFFH certification imposed an obligation that Houston "take no action that

is materially inconsistent with its obligation to affirmatively further fair housing." 80 Fed. Reg. 42,272, 42,365 (later codified at 24 C.F.R. § 91.225(a)(1)).

29.     Pursuant to the 2015 regulation, at 24 C.F.R. § 5.160, Houston's first AFH was to be submitted on or before October 5, 2019.

30.     By Notice dated January 5, 2018, HUD purported to suspend Houston's obligation to conduct an AFH until 2025 or later. This constitutes yet another action by HUD to relieve Houston of its obligation to comply with its AFFH obligations, and to permit Houston to continue to receive Block Grant and other federal funding without attending to its obligations to address pervasive residential segregation in the City of Houston.

31.     HUD is prohibited from disbursing Block Grant funds to Houston for any period during which Houston's Title VI and AFFH certifications are not accurate or have been rejected by the Secretary.

## PARTIES

32.     Plaintiff Texas Low Income Housing Information Service (Texas Housers) is a non-profit corporation with offices in Austin and Houston. It is the principal statewide advocacy group focused on expanding housing opportunities for low-income residents of Texas.

33.     Defendant U.S. Department of Housing and Urban Development (HUD) is an executive branch agency of the United States government. It is charged with administering a variety of federal housing programs, including the programs at issue in this Complaint.

34.     Defendant Ben Carson is sued in his official capacity as the Secretary of HUD.

## JURISDICTION AND VENUE

35.     This Court has jurisdiction over this matter under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

36.     Venue is proper in this District under 28 U.S.C. § 1391(b) and 5 U.S.C. § 703 because the claims arose in this District, Defendants reside in this District, and a substantial part of the events giving rise to this action occurred in this District.

## Facts

37.     Houston is the largest city in Texas, with a population of approximately 2.3 million people. The Census Bureau reports that 25.6% of Houston's residents are non-Hispanic white, 23.1% are non-Hispanic black and 43.8% are Hispanic or Latino of any race. Houston is unusual among local governments in that it does not have zoning laws and, as relevant here, its local codes do not address land use. Rather, development is governed by codes that address how property can be subdivided.

38.     Houston has historically experienced high levels of segregation on the basis of race and national origin. Based on 2010 Census data, Houston has the highest ranking of any city in Texas for segregation by race, with a black-white dissimilarity index of 75.5. Among large cities in the United States, it is one of the most segregated by race.

39.     Houston has designated its Housing and Community Development Department (HCDD) to receive and administer HUD Block Grant and Community Development Block Grant-Disaster Recovery (CDBG-DR) funds, and to prepare and submit reports required by HUD.

40.     Since at least 2010, HUD has been aware of Houston's high levels of segregation and that Houston's policies contribute to this segregation. Nonetheless, it has refused to take effective actions to compel Houston to adjust its housing policies and practices to overcome such segregation, as required by Title VI and AFFH.

41.     After rejecting Houston's 2010 AI because "the City's placement of affordable housing may have served to promulgate segregation," HUD nevertheless accepted Houston's

11

certifications of AFFH compliance for the next four annual funding cycles, knowing that those certifications could not have been accurate because Houston had not corrected the underlying conditions identified by HUD.

**HUD Routinely Accepts Houston's Civil Rights Certifications without Examining Evidence of Their Inaccuracy, and Continues to Fund Houston Despite its Noncompliance**

42.     Since at least 2011, because of Texas Housers' advocacy, HUD has been fully aware that Houston, in seeking millions of dollars in federal housing funds, has not been honest about how racial and ethnic segregation within its borders erects significant barriers to fair housing choice for African-American and Latino residents, particularly families with children. It also has been aware that, even when Houston acknowledges the need to address its profound racial segregation, the City fails to propose—let alone execute—concrete and meaningful plans to address that segregation. That is to say, Houston has been in evident and blatant violation of its obligations under the Fair Housing Act for years, and HUD has known of the violations, yet HUD has done nothing about it.

43.     As detailed below, HUD has consistently ignored both Houston's dishonesty and its failure to address racial and ethnic impediments to fair housing choice arising under Title VI and its AFFH obligation. In the face of stark evidence of noncompliance with those obligations, HUD has routinely accepted Houston's inaccurate civil rights certifications, signed off on its funding contracts, and disbursed hundreds of millions of dollars in Block Grant, CDBG-DR and other funds, even though federal law prohibited the same.

44.     Notwithstanding decades of demographic data indicating that Houston is the most segregated city in Texas, Houston's 2005 AI is silent on the topic of racial or ethnic segregation. It fails to analyze any of its housing programs and policies to determine whether they are helping to overcome the impediment of segregation or simply exacerbating it.

45.     Despite its knowledge of widespread residential segregation on the basis of race and national origin in Houston, HUD routinely accepted Houston's annual Title VI and AFFH certifications and continued funding even though HUD knew that Houston was taking no steps to overcome fair housing impediments related to such segregation.

46.     In April 2010, Houston released its 2010 AI, acknowledging that the "City's housing programs . . . tend to reinforce concentration of minorities by placing affordable housing in areas with historically high levels of racial minorities." (p. 50). In response to that impediment, the 2010 AI commits Houston to "[i]ncrease efforts to place affordable housing programs in nonminority areas [that] will serve to integrate and not reinforce segregation patterns." (p. 62).

47.     But when it came time to translate those abstract findings into specific promises in exchange for federal funds, Houston was much less forthcoming. Houston's subsequent plans and submissions to HUD contained no commitment to, let alone any plan for, addressing the impediments the City had just acknowledged in the 2010 AI. Nor did Houston, in fact, take steps to increase the number of affordable units for families of color in high opportunity areas.

48.     Texas Housers brought the deficiencies in Houston's 2010 AI to HUD's attention through a letter dated October 25, 2011, providing detailed evidence of Houston's failure to address the issue of segregated housing or to take any actions to overcome the effects of segregation. Only because of Texas Housers' vigorous advocacy—highlighting the inaccuracy and insufficiency of Houston's 2010 AI—did HUD take even the minimal step of evaluating whether the 2010 AI complied with federal requirements.

49.     On November 30, 2011, HUD wrote a letter to Houston, rejecting the 2010 AI as "incomplete" and "unacceptable" because it "does not identify as impediments actions known to the [C]ity that perpetuate segregation and restrict the availability of housing to African-Americans

13

[and] Hispanics . . . [and] does not identify actions to address patterns of existing segregation." In particular, it said that Houston would have to focus on how "the [C]ity's placement of affordable housing may have served to promulgate racial segregation."

50.     Having established the predicate for finding Title VI and AFFH violations, HUD then did nothing meaningful about it. It merely offered Houston technical assistance to "correct the deficiencies of the AI and meet compliance." HUD prescribed no deadlines and imposed no sanctions with respect to Block Grant or other HUD funding.

51.     Houston took nearly three years to comply with HUD's directions and did not submit a revised AI to HUD until September 2014. As a result, based on HUD's own findings and determination, Houston did not have an acceptable AI from April 2010 until at least September 2014.

52.     During each of the intervening annual funding cycles for which Houston lacked an acceptable AI, HUD took no action to challenge Houston's AFFH certifications, and instead routinely accepted them, notwithstanding HUD's own factual findings that Houston was not in compliance with those obligations.

53.     As a result, HUD disbursed more than $230 million in Block Grant funding to Houston during a period when federal law deemed Houston ineligible for such funding because it did not have an acceptable AI (and therefore could not have made truthful AFFH certifications).

54.     Houston was ineligible for funding because federal statutes and regulations governing the Block Grant programs expressly condition funding on civil rights certifications. *See* 42 U.S.C. §§ 5304(b), 12872; 24 C.F.R. §§ 91.225, 570.601, 570.602.

55.     As a result, HUD was prohibited from funding Houston for periods during which HUD knew that Houston's Title VI or AFFH certifications were demonstrably false. 24 C.F.R. §§ 91.500(b), 570.304, 570.900, 570.904.

56.     None of Houston's Annual Action Plans or Consolidated Annual Performance and Evaluation Reports (CAPERs) submitted to HUD between November 30, 2011 and September 2014 contained any evidence of programs to address the development of affordable housing in high-opportunity areas or otherwise to take actions to overcome fair housing barriers caused by segregation. During that period, Houston took no steps to increase the number of affordable units for families of color in high opportunity areas. Notwithstanding these deficiencies, HUD accepted the certifications and approved Houston's funding.

57.     Houston distributed a draft of its 2014 Amended AI on September 1, 2014.  On September 20, 2014, Texas Housers objected to HUD that the 2014 Amended AI lacked financial and programmatic commitments to address segregation and promote the development of affordable housing in high-opportunity areas.

58.     Houston finally submitted an Amended 2014 AI to HUD on October 8, 2014. The new AI acknowledged that "[o]verall segregation is, in fact, worsening . . . [and that] Black residents are still highly-segregated" (p. 88). It also notes that "the lack of affordable housing in desirable areas is an area where the City could play a significant role. The City can influence where affordable housing is built, and in some cases control where affordable housing is not built." (p. 125). Nonetheless, the new AI still contained no concrete plans for *fixing* any of these serious problems.

59.

60.     HUD nonetheless accepted Houston's 2014 Amended AI, and informed Houston that it achieved compliance with federal regulations governing the development of AIs. Houston thereafter produced a draft AI in the spring of 2015. The 2015 Draft AI revealed that "[t]here are several areas where publicly supported housing is not available, mainly in the area west of downtown bordered by Interstate 10 to the north and Interstate 69 to the south. This is the same area of the city where private market investment is strongest according to the [Market Value Analysis]."

61.     On April 13, 2015, Texas Housers objected that the 2015 Draft AI contained no programs or funding to address the concentration of affordable housing in high-poverty and minority concentrated neighborhoods, or to provide affordable housing in high-opportunity areas. This letter was forwarded to HUD as part of the public comments received by Houston.

62.     On August 15, 2015, Houston published its final 2015 AI. This document recognized the historic patterns of actions in the City that have perpetuated segregation and committed Houston to take specific actions:

- "The city will work towards creating more housing . . . especially for person[s] in various protected classes *including in higher opportunity areas where housing is generally not available*." (2015 AI, p. 147) (emphasis supplied).

- "The city is committed to promoting economically, racially, and ethnically integrated neighborhoods of opportunity and will take actions to encourage mixed income housing, preserve affordability in neighborhoods rapidly increasing in value, and *create affordability and opportunities to find*

*housing in areas of high opportunity*." (2015 AI, p. 149) (emphasis

supplied).

63.     Since the publication of the 2015 AI, Houston has made no commitment to any

specific actions in furtherance of the commitments made in the previous paragraph except, in its

2016 Action Plan, to give some unspecified preference in HCDD funding for housing proposals in

high-opportunity areas.

64.     Such a modest commitment is an inadequate response to the identified

impediment to fair housing, *i.e.*, Houston's starkly segregated residential neighborhoods. It falls

far short of Houston's obligation to "take appropriate actions to *overcome* the effects of any

impediments identified" in its AI (emphasis supplied). 24 C.F.R. § 91.225(a)(1) (2014).

65.     In particular, Houston's commitment is carefully worded to exclude any action to

encourage or even permit affordable housing developments that are not constructed with HCDD

funds. Thus, Houston did *not* commit to approving projects such as the Fountain View

Apartments, which the City was considering even as it drafted and submitted this action plan. As

described below, by the time Houston submitted this proposal to HUD in May 2016, HUD had

before it evidence of Houston's discriminatory behavior with respect to the Fountain View

application for approval.

66.     Notwithstanding these deficiencies, HUD accepted the certifications and

approved Houston's funding.

67.     At no time since 2011 has HUD determined that Texas Housers' information

concerning segregation and fair housing barriers erected in Houston is inaccurate or incomplete.

Rather, in accepting Houston's civil rights certifications, in continuing to fund Houston, and in

agreeing to the March 2018 VCA with Houston, HUD has simply ignored credible and

compelling evidence of Houston's noncompliance and refused to carry out its own obligations related to Title VI and AFFH.

68.     Beyond the Block Grant funds referenced above, Houston also received tens of millions of dollars in CDBG-DR funds following natural disasters in 2008 and 2015, funds which also require truthful and accurate certifications of compliance with Title VI and AFFH.

### HUD Refuses to Take Meaningful Action Even After Finding That Houston Caved in to Racially Motivated Opposition in Preventing the Development of Fountain View Apartments in a High Opportunity Area

69.     Against that background of Houston's long-standing refusal to address known segregation—and HUD's refusal to do anything about it—Houston in 2016 took such blatantly discriminatory action that HUD could not entirely ignore it. But even after finding that Houston caved in to racially motivated opposition in disallowing an affordable housing project that could have integrated a predominantly white neighborhood, HUD let Houston off with a slap on the wrist that will do nothing to change Houston's conduct.

70.     Public housing developments in Houston have been sited in such a way that public funds are used to exacerbate, rather than ameliorate, Houston's residential segregation. With the active participation, encouragement, and support from the City of Houston over a period of 70 years, the Houston Housing Authority (HHA)—an independent agency that is not a department of city government—routinely placed its affordable "public housing" apartment developments exclusively in Houston neighborhoods characterized by segregation on the basis of race, national origin, and poverty. The following map displays those developments and their neighborhood characteristics.



71.     In early 2014, HHA identified and purchased a parcel in the Galleria district for purposes of building an affordable housing development. The Galleria district is 87 percent white. It has very high household incomes and a poverty rate just one-fifth that of neighborhoods where other HHA properties are located.

72.     After securing provisional financial commitments from sources other than Houston, the HHA proposed in early 2016 to move forward with the development on that parcel of Fountain View Apartments, a 233-unit affordable housing complex slated to be completed in 2018. Most of the units were to be reserved for working-poor families, with some reserved for extremely low-income households and some for households paying market rent.

73.     The Houston Chronicle noted that Fountain View would be HHA's "first in an area considered high-end and high opportunity."

74.     HHA proposed to finance the development, in part, with an allocation of Low Income Housing Tax Credits (Tax Credits) administered by the Texas Department of Housing and Community Affairs (TDHCA) and bond financing. That meant that Houston had the effective power to veto the project, because TDHCA rules provided at the time that no Tax Credits could be issued to HHA for Fountain View unless Houston passed a Resolution of No Objection (Resolution).

75.     The HHA's request for a Resolution became publicly known, and public opposition swiftly followed. On February 19, 2016, the Houston Chronicle reported that residents in the neighborhood where Fountain View was to be built were "mounting a fierce campaign against it, enlisting the help of their city councilman" and other elected officials. As HUD later formally found in its Title VI Letter, their City Councilman Greg Travis publicly opposed Fountain View and met with the Mayor and other Councilmembers about the project.

76.     On March 9, 2016, HHA held a public hearing on the proposal. In that and other public forums, elected officials who opposed the project made racially-coded, derogatory statements about the prospective residents of Fountain View, saying that their presence would "damage our schools, our traffic, and our quality of life." Residents made racially-coded references to increased crime and spoke of the necessity of keeping prospective residents "in their own areas." Still others suggested that the Fountain View proposal "sounds like the same plan they had for busing years ago," and that the families living in subsidized units would reduce property values. Finally, one resident asked whether he would be "forced to take these kids into

my house having to raise, feed and educate them while their parents sit around in their rent-free apartment doing nothing."

77.     As HUD concluded in its Title VI Letter, a "significant number of written and oral comments about the project [directed to Houston officials] used coded language, which when considered in context, has been recognized by courts as expressing racial animus."

78.     The racially discriminatory nature of the opposition was apparent to Houston decision-makers as well as to HUD. Indeed, HUD reported in its Title VI Letter that a number of them—including Neal Rackleff, former director of Houston's HCDD and now Assistant Secretary for Community Planning and Development at HUD—"stated to [HUD] that they believed the local opposition to be shrouded in pretext and racially motivated."

79.     By April 2016, three months after HHA requested that the City approve the Fountain View project, Mayor Turner still had not even submitted a Resolution to City Council. On April 6, 2016, an attorney for Texas Housers wrote to Mayor Turner, advising him that withholding a Resolution on the basis of racially-motivated opposition would constitute a violation of federal civil rights laws, including the AFFH obligation.

80.     Copies of the letter of April 6, 2016 were sent to senior HUD officials, including then HUD Secretary Julian Castro, then Assistant Secretary for Fair Housing and Equal Enforcement Gustavo Velasquez, and his principal deputy, Bryan Greene.

81.     On August 2, 2016, Mayor Turner publicly announced that he would not submit the Resolution to the City Council. Houston thereby deprived HHA of the state tax credits it required to develop Fountain View. Turner said publicly at that time that he had personally advised HUD Secretary Castro of his decision during the month of July.

82.     Although no Houston funds were involved in the development, Mayor Turner stated that his decision was justified by the per unit cost of development. HUD knows full well that was untrue.

83.     In the Title VI Letter, HUD concluded that the Mayor's stated justification for his decision—the per unit cost of development—was "unsupported by the facts," and that "costs were a pretext for the City's acquiescence to the racially-motivated opposition of the local community."

84.     The Title VI Letter also found that "at the time of the Fountain View decision, the Mayor and other City officials were aware of the history of *de jure* and *de facto* segregation in HHA's units (and other affordable housing in the City) and the importance of the Fountain View site for the desegregation efforts of [HHA]."

85.     Texas Housers provided HUD with additional evidence demonstrating that Houston's Fountain View decision was just one more example of Houston's long-standing pattern of discriminatory siting decisions.

86.     On September 28, 2016, Texas Housers provided HUD a map demonstrating that, during the 2014-2016 period, Houston approved Resolutions "overwhelmingly in areas with minority concentration greater than 50% and poverty rates greater than 20%."

87.     On December 5, 2016, Texas Housers provided HUD with evidence regarding Houston's approval of Independence Heights Apartments, another proposed HHA development that was similarly situated to the Fountain View project except that it was in a segregated, high-poverty neighborhood. With respect to that project—which perpetuated segregation rather than redressing it—Houston passed a Resolution of No Opposition.

88.     HUD conducted an investigation of the allegations and evidence provided by Texas Housers and others. On January 11, 2017, it issued the Title VI Letter to Houston. Pursuant to Title VI and HUD's implementing regulations, the Title VI Letter represents the Secretary's final determination.

89.     The Title VI Letter found that Houston's "refusal to issue a Resolution of No Objection" for the Fountain View project "was motivated either in whole or in part by the race, color, or national origin of the likely tenants." It went on to find that this racially discriminatory refusal to clear the Fountain View project was part of a broader problem. Specifically, the Title VI Letter concluded that "the City's procedures for approving Low-Income Housing Tax Credit … applications are influenced by racially motivated opposition to affordable housing and perpetuate segregation."

90.     Notwithstanding this finding that it permitted racial discrimination to dictate project approval decisions, in August 2017, Houston submitted its Annual Action Plan and civil rights certifications, with AFFH certification based on its 2015 AI. The 2017 Annual Action Plan concedes that many of Houston's neighborhoods are segregated by race or ethnicity but proposes no specific actions to overcome the effects of such segregation. Furthermore, it makes no mention whatsoever of Houston's actions to defeat the Fountain View proposal, or its issuance of a Resolution permitting the development of Independence Heights in a segregated, low-opportunity neighborhood.

91.     In other words, during the very period in which HUD knew that Houston's Title VI violations were unresolved, HUD accepted Houston's certifications and approved Houston's receipt of Block Grant funds on the basis of an application it knew to have omitted critical information about Fountain View and Independence Heights.

92.     Notwithstanding these deficiencies and the fact that Houston had not resolved the violations described in the Title VI Letter, HUD accepted the certifications and approved Houston's funding.

93.     When Texas Housers learned that HUD had accepted those certifications and authorized the disbursement of more than $30 million to Houston, it objected. By letter of October 31, 2017, Texas Housers lodged a formal request that HUD examine the validity of Houston's then-current civil rights certifications, in light of the unremedied Title VI violations. It provided still further evidence, together with statutory and regulatory citations, supporting a finding that Houston's certifications are inaccurate and should be rejected as unsatisfactory to the HUD Secretary.

94.     This letter to HUD was addressed to, among others, Mr. Rackleff—who had been confirmed on August 3, 2017 as Assistant Secretary for Community Planning and Development, HUD's principal administrator of the Block Grant and CDBG-DR programs. HUD's response to his role in Houston's discriminatory process was to give him oversight authority over Houston and other jurisdictions who take federal funds.

95.     Between January 11, 2017 and March 9, 2018, Houston took no actions to remedy the violations identified in the Title VI Letter, even as it continued to accept existing streams of federal funds and apply for additional funding for hurricane relief. HUD kept those funding streams going, while taking no action to compel Houston to comply with its Title VI and AFFH obligations. It has taken no action to enforce the violations described in the Title VI Letter, which is its final determination of noncompliance with Title VI.

96.     On March 9, 2018, more than a year after its Title VI Letter, HUD issued a press release announcing a "joint agreement [with Houston] designed to expand housing choice and

mobility for lower income residents." That press release does not even mention that HUD had previously determined that Houston violated Title VI with respect to its treatment of Fountain View and that, in the words of the Title VI Letter, Houston allowed its procedures concerning Resolutions to be "influenced by racially motivated opposition to affordable housing," and that those policies "perpetuate segregation."

97.     Accompanying the press release was a voluntary compliance agreement (VCA) that HUD entered into with Houston. The VCA purports to "resolve[]" HUD's investigation concerning Fountain View and, more broadly, Houston's procedures for considering proposed Resolutions that would permit the development of affordable housing. But its remedial provisions do not provide for the development of Fountain View or any other comparable development in a high opportunity area.

98.     The VCA does not prohibit Houston's Mayor from withholding future Resolutions from City Council consideration. Nor does it put into place any new procedures that prevent racially-motivated opposition to affordable housing from derailing future affordable housing proposals in high opportunity areas. Indeed, the VCA contains none of the provisions that HUD itself said in its Title VI Letter were necessary to remedy Houston's noncompliance.

99.     The VCA offers no explanation for why, in the absence of such provisions, it constitutes a reasonable resolution of what HUD itself found amounted to both a specific Title VI violation and municipal procedures and policies that made further such violations likely.

100.    In short, the VCA amounts to yet another example of HUD choosing not to follow its own statutory duty to ensure Houston's compliance, accepting mere cosmetic changes in City policies and practices and permitting Houston to engage in public relations efforts instead of genuine efforts to comply.

25

101.     There is no administrative right to appeal HUD's decision on the provisions of the

VCA.

### HUD's Refusal to Address Houston's Tragic Failure to Provide Adequate Drainage for Low-Income Communities of Color

102.     HUD's unlawful tolerance of Houston's discriminatory behavior has had

particularly tragic results, because Houston also fails to ensure that predominantly minority

neighborhoods have adequate storm drainage systems. As HUD knows full well, Houston

consigns minority neighborhoods to primitive, "open ditch" drainage systems that fail to protect

those neighborhoods from flooding damage. While no drainage system can stop massive damage

from the worst hurricanes, predominantly white neighborhoods recover more quickly due in part

to the superior underground drainage and storm drains that Houston provides them. HUD knows

of these disparities, but instead of requiring Houston to correct them, it directs flood relief money

as well as regular funding distributions to Houston with no strings attached, thus permitting

Houston to rebuild its neighborhoods unequally.

103.     "Open ditch" drainage means an above-ground, unimproved drainage system that

is open to the elements and is usually built between public rights-of-way and residential or

commercial buildings, such as the one depicted in the following photograph from the Texas Low

Income Housing Information Service file :



104.    On April 22, 2011, Texas Housers wrote to HUD, complaining that Houston's policy regarding flood mitigation "forces large numbers of persons protected under the [FHA] with low incomes to abandon their homes . . . . Their option to remain in a desirable, integrating community of high opportunity is thus denied them."

105.    In 2014, Houston's Department of Public Works commissioned a study to examine all open ditch drainage in the City of Houston. The data collected by the City proved what was already common knowledge in Houston: that the neighborhoods served by open ditch drainage are overwhelmingly those occupied largely by African-American and Latino persons. In many instances, the open ditch system fails to provide the most basic levels of flood protection to these neighborhoods.

106.    Texas Housers' analysis of the City's data—which it has provided to HUD—found that 88 percent of open ditch drainage in Houston is located in African-American neighborhoods.

107.    These open ditches are inadequate protection against the storms that regularly hit Houston, let alone the rarer catastrophic ones. Houston's own data demonstrates that 43 percent of the open ditch drainage system fails to provide adequate flood protection for even a two-year frequency storm event. Many other parts of Houston's open ditch drainage system were found to be incapable of adequately handling floodwater for a five-year or 10-year storm event. This is a much lower level of protection than is provided in many white, non-Latino neighborhoods of Houston.

108.    This evidence is sufficient to demonstrate that Houston knowingly operates a separate and unequal storm water system that results in disproportionate and preventable flooding of African-American and Latino neighborhoods.

109.    Following completion of the HCDD drainage study, Houston failed to act on this information to remedy the inequalities in the provision of this critical infrastructure. Texas Housers mapped the data from the HCDD study and presented these maps to Houston officials at public hearings convened to determine the allocation of CDBG-DR funds, *i.e.*, money earmarked for flood recovery. Houston still took no steps to remedy this dire situation that led to unnecessary flooding damage in minority neighborhoods. Instead, it simply used flood recovery money to rebuild its neighborhoods along the same discriminatory lines, knowing full well that it was tolerating unnecessary risk for similar discriminatory results.

110.    In its April 13, 2015 comments on Houston's 2015-19 Consolidated Plan, Annual Action Plan, and 2015 Draft AI, Texas Housers identified fair housing impediments that Houston

28

had neglected to report to HUD. Principal among these was that "[m]inority neighborhoods in Houston disproportionately lack access to standard city infrastructure, especially storm water drainage."

111.    In that submission, which was forwarded to HUD as part of the public comments received by Houston, Texas Housers provided evidence of Houston's provision of "engineered drainage" for higher income and non-minority neighborhoods, with floodwater then routed through minority neighborhoods with "ditch drainage," thereby exacerbating community flooding.

112.    By letter of August 23, 2016, which was forwarded to HUD as part of the public comments on Houston's 2016 Action Plan for CDBG-DR funds appropriated for unmet needs related to 2015 flood events, Texas Housers presented evidence that residents of minority communities relegated to ditch drainage had been harmed by recurrent flooding, which depressed their property values and subjected them disproportionately to the life-threatening safety and health hazards of frequent flooding.

113.    HUD has failed to act on these warnings.

114.    In mid-August, 2017, Hurricane Harvey made landfall in Houston and caused an estimated $125 billion in damage. *See* https://www.texastribune.org/2018/01/08/hurricane-harvey-was-years-costliest-us-disaster-125-billion-damages/. Among the neighborhoods hardest hit by flooding were the very segregated, poverty-concentrated neighborhoods that were the subject of Texas Housers' 2015 and 2016 comments referenced above.

115.    On October 31, 2017, Texas Housers filed an administrative complaint with HUD, pursuant to Title VI and the Fair Housing Act. It alleged that Houston's "failure to provide equal levels of flood protection to African-American and Latino-segregated neighborhoods harms

people of color directly, by depressing the economic value of their homes and subjecting them to disproportionate physical hazards and property damage resulting from flooding."

116.    While HUD has acknowledged receipt of the new complaint on drainage, it has failed to investigate or resolve its Fair Housing Act claim within 100 days of its submission, as required by 42 U.S.C. § 3610(a)(1)(B)(iv). HUD has not otherwise contacted Texas Housers to discuss the claims or HUD's investigation.

117.    HUD has demonstrated that it will not take action with respect to this clear violation of law.

**Injury to Plaintiff Caused by HUD's Actions**

118.    HUD's systemic failure to enforce Title VI and AFFH obligations on the City of Houston is causing, and will continue to cause, ongoing injury to Texas Housers, whose mission of promoting safe, affordable housing in quality neighborhoods for families of color in Houston and throughout the State of Texas is frustrated by HUD's actions and inactions described herein.

119.    Texas Housers carries out its mission by researching and evaluating low-income housing and community development programs, needs, and issues throughout Texas to discover solutions; promoting public understanding of and support for the same; and organizing and empowering low-income people and communities to take the initiative to solve their own housing and community development problems.

120.    Over the past decade, Texas Housers has worked closely with low-income communities in Houston, the Rio Grande Valley, and other urban communities throughout Texas to obtain or retain safe, affordable housing.

121.    Its work along the Texas-Mexico border focuses on improving substandard housing, fostering new housing development, and overcoming community problems, such as the

lack of drainage and public street lights. Among other things, it helped to develop the RAPIDO program to speed the development of replacement housing in the wake of natural disasters. *See* https://texashousers.net/2016/04/22/rapido-disaster-recovery-housing-model-to-be-exhibited-at-smithsonian/.

122.    Its other advocacy resulted in a 2010 Conciliation Agreement with the State of Texas that has governed the distribution of nearly $2 billion in CDBG-DR funds throughout the State following Hurricanes Dolly and Ike in 2008, and the establishment of a State program whose mandate is to promote home loans to low-income households.

123.    In Houston, Texas Housers has concentrated on permanent housing solutions for victims of the past decade's Gulf Coast Hurricanes, and on the development of quality new, affordable housing outside areas that have historically been segregated on the basis of race, national origin, and/or poverty.

124.    Much of Texas Housers' work in Houston pertains to enabling families of color to move to areas of higher opportunity, including neighborhoods in Houston that are outside of high-poverty, segregated areas.

125.    In Houston, Texas Housers actively promotes the equitable distribution of housing and community development resources. It advocates for programs to expand the supply of rental housing that low-income households can afford outside of racially segregated and resource-poor areas.

126.    As a result of HUD's prolonged failure or refusal to insist on compliance by Houston, the city remains the most segregated city in Texas, and one of the most segregated large cities in the United States. That persistent segregation operates as a substantial barrier to fair

31

housing choice and equitable distribution of infrastructure and community development resources, which makes it more difficult for Texas Housers to accomplish its mission in Houston.

127.     The frustration of its mission and the drain on its resources also injures Texas Housers with respect to its work in other parts of Texas. In order to counteract the harm HUD has caused (as described herein), Plaintiff has been required to interrupt, delay, or scale back its research, analysis, policy development, and community education work in the Rio Grande Valley, Corpus Christi, Beaumont, Port Arthur, and Galveston.

128.     Furthermore, because it has been required to divert its limited resources to secure HUD's enforcement of Houston's civil rights obligations, it has been unable to commence its research and analysis of Harris County's discriminatory treatment of affordable housing development proposals; its review of the Low Income Housing Tax Credit competition for 2017, as operated by TDHCA; and its research and analysis of the impact of a 2015 Texas statute prohibiting local governments from passing ordinances to expand housing choice for low-income Texans using rental subsidies.

129.     If HUD is not required to enforce Title VI and AFFH obligations against Houston, Texas Housers will have to divert much of its time and other resources to projects that, in various ways, counteract the damage that HUD's action is doing to its ability to further its mission. Texas Housers would not have to divert its resources in this way but for HUD's pattern of inaction.

130.     Each day that HUD refuses to require Houston's compliance—while continuing to fund Houston with tens of millions of dollars every year—is a missed opportunity to ensure that families of color can live in high opportunity areas, send their children to high-performing schools, and enjoy the other benefits of living in integrated communities. This decision will have long-lasting consequences for these families.

131.     HUD's failure to timely investigate Plaintiff's October 31, 2017, Fair Housing Act claim concerning discriminatory provision of storm water drainage violates HUD's obligation pursuant to 42 U.S.C. § 3610(a)(1)(B)(iv). By depriving Texas Housers of HUD's assistance in resolving this critical safety and health issue, HUD compels Texas Housers to further divert its limited resources to secure enforcement by other means.

132.     HUD has demonstrated that, absent injunctive relief, it will not conform its conduct to its own obligations under federal law, and will not require Houston to meet the obligations that come as a consequence of accepting federal housing funds.

## CAUSES OF ACTION

### First Cause of Action
### Administrative Procedure Act – Review of Agency Action

133.     The APA empowers this Court to review and "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C § 706(1).

134.     HUD has failed for years to require Houston to comply with Title VI and AFFH despite clear evidence before it (and despite its own findings) that Houston is not in compliance, and it has accepted on many occasions what it knows to be Houston's false certifications of compliance with these laws to get federal funds. Through this policy of refusing to act against Houston notwithstanding knowledge that Houston is in violation of the law, HUD has unlawfully withheld and delayed agency actions that are mandated by statute and regulation and therefore not within HUD's power to waive.

135.     Standards by which HUD's conduct may be judged are established by statutory and regulatory requirements that HUD assure compliance with Title VI and the obligation to AFFH in specific ways.

136.     HUD violates the APA by unreasonably delaying or denying the following actions:

33

a.  Sanctioning Houston for its inaccurate civil rights certifications;

b.  Withholding funding when it had evidence that Houston was not in compliance
with its civil rights obligations; and

c.  Failing or refusing to timely act on Plaintiff's October 31, 2017 Fair Housing
Act complaint against Houston for discriminatory administration of its drainage
and storm water abatement infrastructure, as required by 42 U.S.C. §
3610(a)(1)(B)(iv).

**Second Cause of Action**
**Administrative Procedure Act – Agency Action that Is Arbitrary, Capricious, or an**
**Abuse of Discretion**

137.    The APA empowers this Court to "hold unlawful and set aside" agency action
that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5
U.S.C. § 706(2)(A).

138.    By its repeated actions to approve Block Grant and CDBG-DR funding for
Houston in the face of clear evidence and HUD's own findings that Houston has violated Title VI,
HUD has taken a series of final actions in approving funding despite false certifications of civil
rights compliance for which it has offered no justification. These actions violate federal law
governing the distribution of such funding.

139.    HUD lacks legal authority to ignore its obligations under funding statutes, Title
VI, and the Fair Housing Act to enforce civil rights obligations on Houston and other recipients of
such funding.

140.    HUD's actions and inactions materially undermine the purposes of Congressional
funding statutes, Title VI, and the Fair Housing Act.

141.    Even if HUD had authority, given sufficiently compelling reasons, to excuse Houston's noncompliance, it has articulated no such reasons, nor could it on the record before it. Its actions over more than a decade are inconsistent with its own obligations under Title VI and AFFH and its actions and inactions therefore, are unreasonable, arbitrary, and capricious.

### Third Cause of Action
### Administrative Procedure Act – Action Contrary to Statute

142.    The APA empowers this Court to set aside an agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

143.    HUD has an affirmative obligation under the FHA to ensure that federal housing programs are administered, and federal housing funds spent, in a manner that furthers racial desegregation and combats the related problem of concentration of poverty where possible.

144.    In failing or refusing to hold Houston accountable for its violations of Title VI and AFFH, HUD is affirmatively choosing to distribute federal housing funds in a manner that it has found to perpetuate racial segregation and to interfere with the ability of households of color to live in high opportunity, lower poverty, less racially concentrated areas. As HUD itself has stated:

> [I]n areas with a history of segregation, if a program participant has the ability to create opportunities outside of the segregated, low-income areas but declines to do so . . . there could be a legitimate claim that HUD and its program participants were acting to preclude a choice of neighborhoods to historically segregated groups.

Affirmatively Furthering Fair Housing, 80 Fed. Reg. 42,279 (Jul. 16, 2015). In ignoring the requirements that Houston comply with Title VI and AFFH, HUD is doing exactly that. It also is acting in a way that has a significant, adverse disparate impact on African Americans and Latinos without any sufficient justification for doing so.

145.    HUD's longstanding failure or refusal to require Houston's compliance thus violates HUD's obligations to ensure that its programs and activities affirmatively further fair housing as required by 42 U.S.C. §§ 3608(e)(5) and 5304(b), in contravention of the APA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Texas Housers prays that this Court:

(a)    enter a declaratory judgment that HUD's failure to require Houston to comply with Title VI and AFFH—while continuing to fund Houston in a manner that facilitates and exacerbates segregation—violates the Administrative Procedure Act, 5 U.S.C. § 706, because it is arbitrary, capricious, an abuse of discretion, or contrary to law, and without observance of procedure required by law;

(b)    issue temporary and permanent injunctions requiring HUD to enforce Title VI, AFFH, and related obligations against Houston, to withhold further disbursements of Block Grant, CDBG-DR, or other HUD funding to Houston until such time as it comes into compliance with those obligations, and to compel HUD to investigate Plaintiff's October 31, 2017 Fair Housing Act complaint concerning drainage;

(c)    direct HUD to take all affirmative steps necessary to remedy the effects of the illegal conduct described herein and to prevent similar occurrences in the future;

(d)    award Plaintiff its reasonable attorneys' fees and costs; and

(e)    order such other relief as this Court deems just and equitable.

Dated: March 20, 2018                    Respectfully submitted,

s/Michael Allen
Michael Allen (DC Bar No. 409068)
Sara Pratt (DC bar admission pending)
Sasha Samberg-Champion (DC Bar No. 981553)
RELMAN, DANE & COLFAX PLLC
1225 19th Street, NW, Suite 600

Washington, DC 20036
Phone: (202) 728-1888
Fax:     (202) 728-0848
mallen@relmanlaw.com

*Attorneys for Plaintiff*