# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TEXAS LOW INCOME HOUSING INFORMATION SERVICE,<br><br>     *Plaintiff,*<br>v.<br><br>BEN CARSON, Secretary of Housing and Urban Development, in his official capacity, and U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,<br><br>     *Defendants.* | Civil Action No. 18-644 (TJK) |

## <u>MEMORANDUM OPINION</u>

Texas Housers, a nonprofit dedicated to promoting affordable housing, brings this case against the Department of Housing and Urban Development (HUD) and its Secretary for their alleged failure to enforce federal civil rights laws against the City of Houston. Defendants have moved to dismiss the complaint, arguing that Texas Housers lacks standing because, among other reasons, (1) it lacks a legally cognizable injury, and (2) any injury it *did* suffer is not redressable because it was caused by Houston, as opposed to HUD. For the reasons discussed below, the Court agrees that Texas Housers lacks standing. The Court will therefore grant Defendants' motion and dismiss the complaint.

I.    **Background**

    A.    **Statutory and Regulatory Background**

        1.    **Title VI of the Civil Rights Act of 1964**

Under Title VI of the Civil Rights Act of 1964, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal

financial assistance." 42 U.S.C. § 2000d.  An agency empowered to provide financial assistance as part of a federal program or activity, such as HUD, must enforce this dictate "with respect to such program or activity by issuing rules, regulations, or orders of general applicability" and may terminate or refuse to grant financial assistance "to any recipient as to whom there has been an express finding on the record, after an opportunity for a hearing, of a failure to comply with such requirement[s]." 42 U.S.C. § 2000d-1.  Even so, "no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means." *Id.*

Under HUD's regulations, if an investigation reveals a failure to comply with nondiscrimination requirements, "the matter will be resolved by informal means whenever possible." 24 C.F.R. § 1.7.  Only if "noncompliance cannot be corrected by informal means" may HUD effect compliance "by the suspension or termination of or refusal to grant or to continue Federal financial assistance." 24 C.F.R. § 1.8.

### 2.     Title VIII of the Civil Rights Act of 1968 (Fair Housing Act)

Title VIII of the Civil Rights Act of 1968, commonly known as the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*, prohibits discrimination in housing on the basis of race, color, religion, sex, national origin, familial status, or disability.  The Act provides that "[a]ll executive departments and agencies shall administer their programs and activities relating to housing and urban development . . . in a manner affirmatively to further the purposes of this subchapter." 42 U.S.C. § 3608(d).  The Act also provides that HUD must "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter," 42 U.S.C. § 3608(e)(5), "a requirement known as the 'affirmatively further fair housing,' or 'AFFH,' requirement." *Nat'l Fair Hous. All. v. Carson*, 330 F. Supp. 3d 14, 24–25

(D.D.C. 2018).  The Act provides a right to sue in federal courts for any "aggrieved person" alleging a "[d]iscriminatory housing practice," 42 U.S.C. § 3613(a).  The Act does not provide a cause of action to enforce § 3608, but federal courts have the power to review claims that HUD has failed to administer its programs in a manner that affirmatively furthers fair housing, *Nat'l Fair Hous. All.*, 330 F. Supp. 3d at 25.

### 3.   Housing and Community Development Act of 1974 and Community Development Block Grant Disaster Recovery Funds

The Housing and Community Development Act of 1974 (HCDA), as amended, 42 U.S.C. § 5301 *et seq.*, established a program through which HUD provides community development block grants to state and local governments.  The Community Development Block Grant Program (CDBG), 42 U.S.C. § 5301 *et seq.*, awards annual grants to provide housing and "expand[] economic opportunities, principally for persons of low and moderate income."  42 U.S.C. § 5301(c).  To receive certain funds, including CDBG funds, a jurisdiction must regularly submit a consolidated plan to HUD that describes an assessment of housing needs in the jurisdiction, the strategic plan to address those needs, and how the funds will be used.  24 C.F.R. §§ 91.2(a), 91.15.  In each plan, block grant recipients must also certify that they will comply with the requirements of the program, including the obligation to affirmatively further fair housing.  42 U.S.C. §§ 5304(b)(2), 12705(b).  Along with annual block grants, HUD oversees the distribution of Community Development Block Grant Disaster Recovery (CDBG-DR) funding to restore infrastructure and housing and provide other long-term recovery needs to jurisdictions struck by major disasters.  *See, e.g.*, 81 Fed. Reg. 39,687, 36,692 (June 17, 2016).

As part of its certification, between 1995 and 2015, Houston had to "conduct an analysis to identify impediments to fair housing choice within the jurisdiction [referred to as an 'AI'], take appropriate actions to overcome the effects of any impediments identified through that

analysis, and maintain records reflecting the analysis and actions in this regard." 24 C.F.R. § 91.225 (2014). In 2015, HUD promulgated a regulation requiring that Houston and other jurisdictions complete an Assessment of Fair Housing instead of an AI, which also required the jurisdictions to certify that they will "take no action that is materially inconsistent with its obligation to affirmatively further fair housing." 24 C.F.R. § 91.225(a)(1).

### B. Factual Background

#### 1. Texas Low Income Housing Information Service

The Court accepts as true the allegations in the complaint. Texas Low Income Housing Information Service ("Texas Housers") is a nonprofit organization dedicated to promoting safe, affordable housing in quality neighborhoods for families of color in Houston and the State of Texas. ECF No. 1 ("Compl.") ¶¶ 2, 118. "Texas Housers carries out its mission by researching and evaluating low-income housing and community development programs, needs, and issues throughout Texas to discover solutions; promoting public understanding of and support for the same; and organizing and empowering low-income people and communities to take the initiative to solve their own housing and community development problems." *Id.* ¶ 119. Over the last decade, Texas Housers has engaged in several projects in Houston, including working "on permanent housing solutions for victims of recent hurricanes, and on the development of quality new, affordable housing outside areas that have historically been segregated on the basis of race, national origin, and/or poverty." *Id.* ¶¶ 120–23. Texas Housers also "actively promotes the equitable distribution of housing and community development resources." *Id.* ¶ 125.

#### 2. Houston's Alleged Failures and Receipt of Block Grant Funding

Despite Houston's racial and ethnic diversity, *id.* ¶ 37, Texas Housers alleges that the city remains "one of the most segregated large cities in the country" and has failed to affirmatively further fair housing in several ways. *Id.* ¶ 1. First, Texas Housers alleges that Houston has

refused "to permit affordable housing complexes in predominantly white neighborhoods even as the City permits such developments in predominantly minority neighborhoods." *Id.* ¶ 6. Second, Texas Housers alleges that Houston "has failed to address the water drainage needs of most of Houston's racially- and ethnically-segregated neighborhoods, thereby subjecting them to repeated and prolonged flooding in the wake of hurricanes, tropical storms, and other natural disasters." *Id.* ¶ 11. As a result, these neighborhoods are subject to "repeated and prolonged flooding in the wake of hurricanes, tropical storms, and other natural disasters." *Id.*

Texas Housers contends that from 2011 until the time it filed this action, Houston submitted AIs and other annual grant submissions that included false certifications that it would affirmatively further fair housing. *Id.* ¶¶ 42–68. And in fact, HUD reviewed the AI that Houston submitted in 2010 and identified in an October 2011 letter certain deficiencies on Houston's part, including evidence that the city failed to address "the issue of segregated housing or to take any actions to overcome the effects of segregation." *Id.* ¶ 48. HUD then rejected the 2010 AI in a November 2011 letter, concluding that Houston did not "identify actions to address patterns of existing segregation" and that its "placement of affordable housing may have served to promulgate racial segregation." *Id.* ¶ 49. In 2014, Houston submitted a revised 2010 AI to HUD, which the agency accepted. *Id.* ¶ 51. In the intervening years, Houston continued to submit certifications that it was affirmatively furthering fair housing and, in turn, continued to receive more than $230 million in block grant funding. *Id.* ¶¶ 52–53. HUD also accepted and approved Houston's 2014 and 2015 AIs despite Texas Housers' objections that they "contained no programs or funding to address the concentration of affordable housing in high-poverty and minority concentrated neighborhoods, or to provide affordable housing in high-opportunity areas." *Id.* ¶ 61; *see id.* ¶¶ 57–66. And Houston received tens of millions of dollars in CDBG-

DR funds following natural disasters in 2008 and 2015, which required Houston to certify to

HUD its compliance with Title VI and the Fair Housing Act. *Id.* ¶ 68.

### 3. HUD's Investigations of Houston

In August 2016, HUD began to investigate whether Houston engaged in race- or national-

origin based discrimination in its handling of a proposed affordable housing complex known as

Fountain View Apartments, as well as its procedures for approving Low Income Housing Tax

Credit applications. *See* Compl., Ex. 1. In January 2017, HUD informed Houston that it had

concluded, based on its investigation, that the City's failure to bring the approval of the Fountain

View Apartments to a vote was "motivated either in whole or in part by the race, color, or

national origin of the likely tenants." *Id.* at 1. HUD informed Houston that it could take certain

corrective actions to reach a voluntary resolution to the investigation. But HUD further noted

that "[i]f a voluntary resolution cannot be obtained, [it] may initiate administrative proceedings

or refer this matter to the United States Department of Justice for judicial enforcement." *Id.* at

14.

Houston entered into a Voluntary Compliance Agreement with HUD to resolve the

matter in March 2018. *See* ECF No. 13-1, Declaration of Garry Sweeney ("Sweeney Decl.")

¶ 11, Ex. F at 1–18. In that agreement, HUD acknowledged that Houston disputed its findings in

the January 2017 letter. ECF No. 13-1, Ex. F at 1. Still, HUD and Houston agreed that, to avoid

a "time-consuming" dispute, all the "issues, findings, concerns, and questions" raised in that

letter would be "fully and finally resolved" by the agreement. *Id.* Under the Agreement,

Houston committed to: (1) implementing a "Voucher Mobility Pilot program to encourage

landlords in all areas of the City to rent to qualified families regardless of source of income," *id.*

at 3; (2) seeking to provide additional funding for the Houston Housing Authority, *id.*; (3)

certifying that it developed clear minimum standards for approving new housing tax credit

developments, *id.* at 3–4; and (4) receiving technical assistance to identify opportunities to affirmatively further fair housing through the deployment of disaster recovery funding, *id.* at 4.

In October 2017, Texas Housers filed an administrative complaint with HUD, alleging that Houston's "failure to provide equal levels of flood protection to African-American and Latino-segregated neighborhoods harms people of color directly, by depressing the economic value of their homes and subjecting them to disproportionate physical hazards and property damage from flooding." Compl. ¶ 115. In November 2017, HUD acknowledged receipt of the letter. Sweeney Decl. ¶ 9. And in April 2018, a month after this suit was filed, HUD notified Houston that it was processing the complaint and investigating its claims. *Id.* ¶ 12.

## II.     This Action

In March 2018, Texas Housers filed the instant complaint with three causes of action under the Administrative Procedure Act (APA), 5 U.S.C. § 706. First, the complaint alleges that HUD "unlawfully withheld or unreasonably delayed" taking enforcement action against Houston to bring it into compliance with Title VI and the grant requirements of the HCDA. Compl. ¶¶ 133–36. Second, it alleges that HUD acted arbitrarily and capriciously by approving Houston's access to various federal block grant programs and CDBG-DR funds "despite false certifications of civil rights compliance for which it has offered no justification." *Id.* ¶¶ 137–41. Third, it alleges that HUD failed to ensure that Houston affirmatively distributes federal housing funds "in a manner that furthers racial desegregation" as required by Title VI and the AFFH requirement. *Id.* ¶¶ 142–45.

HUD moved to dismiss the complaint. ECF No. 13 ("MTD"). Texas Housers opposed the motion, ECF No. 16 ("Opp'n"), and HUD replied, ECF No. 17 ("Reply"). The Court held a hearing on the motion in July 2019. ECF No. 19 ("Hr'g Tr.").

### III.    Legal Standard

A motion to dismiss under Rule 12(b)(1) tests whether a federal court has subject-matter jurisdiction over a case.  Courts "have an affirmative obligation 'to consider whether the constitutional and statutory authority exist for us to hear each dispute.'"  *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 196 (D.C. Cir. 1992)).  If the Court "concludes that it lacks subject-matter jurisdiction, [it] must dismiss the complaint in its entirety."  *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).  Because federal law presumes that a cause lies outside a federal court's jurisdiction, the plaintiff bears the burden of establishing the factual predicates of jurisdiction.  *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

"The court must accept as true all well-pleaded factual contentions and draw all reasonable inferences therefrom, but it need not accept thread-bare recitals of the elements of standing or legal conclusions couched as an assertion of fact."  *Marouf v. Azar*, 391 F. Supp. 3d 23, 29 (D.D.C. 2019).  Additionally, "[t]he court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion because subject-matter jurisdiction focuses on the court's power to hear the claim."  *Adams v. U.S. Capitol Police Bd.*, 564 F. Supp. 2d 37, 40 (D.D.C. 2008).  And when considering a motion under Rule 12(b)(1), "[a] court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  *Herbert*, 974 F.2d at 197.

### IV.    Analysis

An organization may assert standing "on its own behalf, on behalf of its members or both."  *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) ("*PETA*") (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138

(D.C. Cir. 2011)). Texas Housers argues that it has standing based on its own cognizable injury resulting from HUD's alleged failure to enforce Houston's civil rights obligations. Opp'n at 13. The Court must therefore consider whether it has shown an "actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *PETA*, 797 F.3d at 1093 (quoting *Equal Rights Ctr.*, 633 F.3d at 1138).

### A.    Injury in Fact

To satisfy the injury-in-fact requirement, an organization must allege that it suffered a "concrete and demonstratable injury to [its] activities—with the consequent drain on [its] resources—[that] constitutes far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). The D.C. Circuit has articulated a two-prong test for determining whether an organization meets this standard.

First, the organization must plausibly allege "that the defendant's 'action or omission to act injured the organization's interest." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (quoting *PETA*, 797 F.3d at 1094). To make such a showing, the organization must plausibly allege that the challenged conduct "perceptibly impaired [its] ability to provide services" by causing an "inhibition of [the organization's] daily operations." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C Cir. 2015) (second alteration in original) (quoting in first part *Turlock Irrigation Dist. v. F.E.R.C.*, 786 F.3d 18, 24 (D.C. Cir. 2015) and in second part *PETA*, 797 F.3d at 1094). In defining this requirement, the D.C. Circuit has "distinguished between organizations that allege that their activities have been impeded from those that merely allege that their mission has been compromised." *Abigail All. for Better Access to Dev. Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006). As such, "an organization's abstract interest in a problem is insufficient to establish standing, 'no matter how longstanding the interest and no matter how qualified the

organization is in evaluating the problem.'" *Am. Soc'y For Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)). Additionally, the organization must plausibly allege the existence of a "direct conflict between the defendant's conduct and the organization's mission." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (emphasis omitted) (holding that such a conflict "is necessary—though not alone sufficient—to establish standing").

Second, the organization must plausibly allege that it "used its resources to counteract [the alleged] harm." *Food & Water Watch*, 808 F.3d at 919 (quoting *PETA*, 797 F.3d at 1094). Relying on "use of resources for litigation, investigation in anticipation of litigation, or advocacy" does not suffice. *Id.* Nor does "'expend[ing] resources to educate [an organization's] members and others' unless doing so subjects the organization to 'operational costs beyond those normally expended.'" *Id.* at 920 (quoting *Nat'l Taxpayers Union v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995)). Rather, an organization must allege that it used its resources "in response to, and to counteract, the effects of the defendant['s]" challenged conduct, *Equal Rights Ctr.*, 633 F.3d at 1140, and for a purpose other than advocacy or litigation, *Turlock Irrigation Dist.*, 786 F.3d at 24 ("This is true whether the advocacy takes place through litigation or administrative proceedings.").

In its complaint, Texas Housers asserts that it "carries out its mission by researching and evaluating low-income housing and community development programs, needs, and issues throughout Texas to discover solutions; promoting public understanding of and support for the same; and organizing and empowering low-income people and communities to take the initiative to solve their own housing and community development problems." Compl. ¶ 119. Texas Housers pleads that it has "been wrongly deprived of HUD's enforcement to require Houston to

comply with its federal civil rights obligations." *Id.* ¶ 16. HUD's "prolonged failure or refusal to insist on compliance by Houston," it alleges, has caused "persistent segregation" in the city, "which makes it more difficult for Texas Housers to accomplish its mission in Houston." *Id.* ¶ 126.

Texas Housers further alleges that it "has been required to divert its scarce resources away from advocacy for low-income Texans in other regions of the state to document and repeatedly challenge HUD's failure to abide by its own civil rights obligations with respect to Houston." *Id.* ¶ 2. It pleads that it "has been required to interrupt, delay, or scale back its research, analysis, policy development, and community education work" in other parts of Texas. *Id.* ¶ 127. For example, Texas Housers contends that it has been forced to curtail "its research and analysis of Harris County's discriminatory treatment of affordable housing development proposals; its review of the Low Income Housing Tax Credit competition for 2017 . . . ; and its research and analysis of the impact of a 2015 Texas statute prohibiting local governments from passing ordinances to expand housing choice for low-income Texans using rental subsidies." *Id.* ¶ 128. And if HUD is not required to act against Houston, Texas Housers alleges that it "will have to divert much of its time and other resources to projects that, in various ways, counteract the damage that HUD's action is doing to [Texas Housers'] ability to further its mission." *Id.* ¶ 129.

Texas Housers does not plausibly allege a sufficient injury to its interest under the law of this Circuit. For that reason, it never gets past the first step of the *Havens* organizational standing test. Texas Housers asserts a few broad injuries to its overall "mission." *Id.* ¶ 126 (alleging that HUD's inaction has led to "persistent segregation [that] operates as a substantial barrier to fair housing choice and equitable distribution of infrastructure and community

development resources, which makes it more difficult for Texas Housers to accomplish its mission in Houston"). These allegations are plainly insufficient. "An organization must allege more than a frustration of its purpose because frustration of an organization's objectives 'is the type of abstract concern that does not impart standing.'" *Food & Water Watch*, 808 F.3d at 919 (quoting *Nat'l Taxpayers Union*, 68 F.3d at 1433). In other words, standing must be based on more than an allegation that an agency's actions, or lack thereof, have put more distance between an organization and the ends it seeks. Moreover, that the ends Texas Housers seeks ultimately depend on the subsequent action of a third party—Houston—makes its purported injury even more nebulous. When a plaintiff asserts a chain of allegations for standing purposes, a court may "reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties)." *Id.* at 913 (quoting *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015)).

Texas Housers also references the advocacy efforts it undertakes to advance its mission: "researching and evaluating low-income housing and community development programs, needs, and issues throughout Texas to discover solutions; promoting public understanding of and support for the same; and organizing and empowering low-income people and communities to take the initiative to solve their own housing and community development problems." Compl. ¶ 119. But Texas Housers does not allege that HUD's inaction has directly impeded its ability to engage in advocacy: it remains able to research and evaluate housing programs, needs, and issues throughout Texas. *Id.* ¶¶ 127–28. And more fundamentally, injury to an organization's advocacy efforts does not count for standing purposes. The key inquiry is whether the plaintiff has alleged that "the defendant's conduct 'perceptibly impaired' the organization's ability to provide *services*." *Turlock Irrigation Dist.*, 786 F.3d at 24 (emphasis added) (quoting *Equal*

*Rights Ctr.*, 633 F.3d at 1138–39). An organization has not stated an injury in fact if it "does not allege impairment of its ability to provide services, [but] only impairment of its advocacy." *Id.*; *see also Int'l Acad. of Oral Med. & Toxicology v. The U.S. Food & Drug Admin.*, 195 F. Supp. 3d 243, 256 (D.D.C. 2016) (considering "whether the injury relates to the organization's mere advocacy objectives or if, instead, it undermines the organization's direct, non-advocacy services"). The complaint does not allege that HUD has impaired Texas Housers' ability to provide any non-advocacy services. *See Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005) (rejecting standing where "the only 'service' impaired is pure issue-advocacy"). Therefore, it has not plausibly alleged a cognizable injury in fact.

In response, Texas Housers argues, first, that all its work is not fairly characterized as advocacy. Opp'n at 16. It points to allegations that it conducts "research, analysis, policy development, and community education work" in other parts of Texas. Compl. ¶ 127. And second, it asserts that it was injured because it has had "to interrupt, delay, or scale back" that work to focus on HUD's inaction. *Id.* For example, because it had to "divert its limited resources to secure HUD's enforcement of Houston's civil rights obligations," it claims that it was "unable to commence" other projects, such as an analysis of a Texas county's discriminatory treatment of affordable housing development proposals and a review of a Low Income Housing Tax Credit competition. *Id.* ¶ 128.

This Texas two-step does not an create an injury in fact. Admittedly, the line between advocacy and non-advocacy services can be blurry. *See Am. Soc'y for Prevention of Cruelty to Animals*, 659 F.3d at 27 ("[M]any of our cases finding [organizational] standing involved activities that could just as easily be characterized as advocacy—and, indeed, sometimes are."). In the Court's view, however, Texas Housers' activities are more accurately described as

advocacy. But no matter how its activities are characterized, Texas Housers must plausibly allege that HUD's inaction "perceptibly impaired" its ability to provide services or that its "daily operations" were impeded, *Food & Water Watch*, 808 F.3d at 919 (quoting in second part *PETA*, 797 F.3d at 1094). It has not done so. As noted above, Texas Housers does not assert that HUD's inaction directly impaired its ability to research, analyze, or perform work on these other projects. *See* Compl. ¶¶ 127–28. Rather, it alleges it could not undertake these projects because it has chosen, at least at this point, "to divert its limited resources to secure HUD's enforcement of Houston's civil rights obligations." *Id.* ¶ 128; *see also* Opp'n at 13. But at step one of the *Havens* standing test, the "pivotal inquiry is . . . not whether the organization has diverted resources from one priority to another, but whether its *activities have been directly impeded* by defendant's activities, thus necessitating the diversion of resources." *Long Term Care Pharmacy All. v. UnitedHealth Grp., Inc.*, 498 F. Supp. 2d 187, 192 (D.D.C. 2007) (emphasis added). Texas Housers' has not alleged that its activities—advocacy or not—have been so directly impeded. Rather, the injuries it complains of merely reflect budgetary choices based only on the "frustration of an organization's objectives." *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005) (quoting *Nat'l Treasury Emps. Union*, 101 F.3d at 1429). This is precisely the sort of harm that does not confer organizational standing. *Id.* at 1161–62. Texas Housers has effectively alleged that it has more work to do because of HUD's inaction. But that does not mean it has suffered an injury in fact sufficient for organization standing. *See Elec. Privacy Info. Ctr. v. U.S. Dep't of Educ.*, 48 F. Supp. 3d 1, 23 (D.D.C. 2014) (noting that "the expenditures that [a privacy-focused public interest organization] has made in response to [an allegedly unlawful rule] have not kept it from pursuing its true purpose as an organization but have contributed to its pursuit of its purpose").

This case is easily distinguishable from others in which organizations promoting fair housing adequately pleaded injuries in fact. In *Havens Realty Corp. v. Coleman*, for example, the Supreme Court held that a nonprofit organization pleaded a cognizable injury by alleging that the defendant's "racial steering" practices—where it incorrectly advised black individuals that apartments in certain areas were unavailable—perceptibly impaired the organization's "ability to provide counseling and referral services for low-and moderate-income homeseekers." 455 U.S. at 379. Texas Housers has not alleged that it provides such direct services, nor has it alleged that HUD's inaction caused any particular impairment to any non-advocacy services it does provide beyond general frustration of its mission.

For this reason, the injury it alleges resembles that discussed in *National Fair Housing Alliance v. Carson*, 330 F. Supp. 3d 14 (D.D.C. 2018). In that case, Texas Housers and other plaintiffs alleged that HUD and Secretary Carson unlawfully withdrew a fair housing assessment tool that purportedly "ma[de] it far easier to develop and promote local policies that affirmatively further fair housing." *Id.* at 44. In holding that the plaintiff organizations had not adequately alleged an injury, Chief Judge Howell noted that "the plaintiffs are largely engaged in the same kinds of activities now that they were undertaking before the withdrawal of the [assessment tool] . . . namely, education, research, advocacy, and counseling," even if "withdrawal of the [t]ool merely makes their efforts less 'efficient[ ].'" *Id.* at 49 (last alteration in original). As discussed above, Texas Housers has not alleged that HUD's inaction has impaired its ability to research, analyze, or educate; indeed, the complaint itself incorporates research and analysis that Texas Housers has undertaken to support its claims in this very case. Compl. ¶¶ 12, 106. Nor has Texas Housers, like the plaintiffs in *National Fair Housing Alliance*, pleaded a "dollar figure to show an increase in its operational costs" that it will have to endure because of HUD's inaction,

which in any event was insufficient to show injury in that case. *See* 330 F. Supp. 3d at 50; *see generally* Compl.

None of the other cases cited by Texas Housers save its claims. In *Open Communities Alliance v. Carson*, the plaintiff organization provided direct services to individuals and families with housing vouchers, permitting them to move to higher-opportunity areas. 286 F. Supp. 3d 148, 177–78 (D.D.C. 2017). There, Chief Judge Howell found, on a motion for preliminary injunction, that an organization had shown that an agency's delay of a rule "frustrate[d] [the organization's] ability to assist voucher holders gain access to greater opportunity." *Id.* at 178. The agency's inaction in that case directly affected the value of housing vouchers; that, in turn, hampered the organization's work with developers to build affordable housing and forced the organization to abandon plans to launch a "web portal" built around the anticipated rule's effects. *Id.* But as Defendants point out, Texas Housers has not alleged that it provides similar services and suffered similar injuries to its daily activities. Reply at 5.

Similarly, in *League of Women Voters of the United States v. Newby*, the D.C. Circuit concluded that a change to the instructions on a voter registration form caused an injury to an organization that had been registering voters sufficient to confer standing. 838 F.3d 1, 13 (D.C. Cir. 2016). The specific injury in that case was the impairment of the organization's ability to register voters, while its increased expenditures were "merely a symptom of that programmatic injury." *Id.* at 9. Texas Housers' allegations that it has had to focus its research, education and policy development efforts on Houston at the expense of other areas in Texas is a far cry from the direct impairment of day-to-day services that courts recognized as sufficient for standing purposes in these cases.

Texas Housers also argues that organizations may suffer cognizable harm if an agency deprives them of "'access to information and avenues of redress they wish to use in their routine' activities in furtherance of their missions." Opp'n at 17 (quoting *Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 937–38 (D.C. Cir. 1986)). At the hearing on its motion, Texas Housers doubled down on this contention, emphasizing that if HUD had been properly enforcing the law, then Houston would be providing assessments of its housing market to HUD that would contain information of value to Texas Housers. *See, e.g.*, Hr'g Tr. 12:1–7. But Texas Housers failed to plead an injury stemming from a lack of information in its complaint, relying instead on the "frustration of its mission and the drain on its resources." Compl. ¶ 127.[1] It also did not plausibly allege that it has been denied "a means by which to seek redress." *PETA*, 797 F.3d at 1095. Nor did it allege the basic elements of an informational injury. *See Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (outlining the basic requirements when pleading an informational injury). And even if it had included its arguments at the hearing in its complaint, Texas Housers has not explained with any specificity how a lack of information from Houston has perceptibly impaired its ability to provide services or has otherwise injured it. *See generally* Compl. Its allegations at the hearing about a purported informational injury are therefore dissimilar to those in *Action Alliance*, where the plaintiff pleaded that the denial of its

---

[1] "It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." *Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003) (quoting *Coleman v. Pension Benefit Guar. Corp.*, 94 F. Supp. 2d 18, 24 n.8 (D.D.C. 2000)). Even if this were not fatal to the claim, Texas Housers has not shown that it has informational standing, which "arises 'only in very specific statutory contexts' where a statutory provision has 'explicitly created a right to information.'" *Am. Farm Bureau v. EPA*, 121 F. Supp. 2d 84, 97 (D.D.C. 2000) (quoting *Animal Legal Def. Fund, Inc. v. Espy*, 23 F.3d 496, 502 (D.C. Cir. 1994)).

access to information directly impaired its "routine information-dispensing, counseling, and referral activities." 789 F.2d at 938.[2]

## B.    Redressability

Besides an injury in fact, organizations must meet the other two requirements for standing: causation and redressability.  Causation, or traceability, requires that the asserted injury be "fairly traceable to the defendant's allegedly unlawful conduct," *Am. Soc'y for Prevention of Cruelty to Animals*, 659 F.3d at 24, as opposed to an injury "that results from the independent action of some third party not before the court," *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42 (1976).  And redressability requires "it [to] be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *E. Ky. Welfare Rights Org.*, 426 U.S. at 38, 43).  If the "plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) or *someone else*, much more is needed [to establish causation and redressability]." *Id.* at 562.  In that circumstance, "it becomes the burden of the plaintiff to adduce facts showing that [the] choices [of those third parties] have been or will be made in such a manner as to produce causation and permit redressability of injury." *Id.*

The D.C. Circuit has "identified two categories of cases where standing exists to challenge government action though the direct cause of injury is the action of a third party."

---

[2] In its complaint, Texas Housers also alleged, as part of its APA claims, that HUD failed to act in response to Texas Housers' October 2017 administrative complaint about Houston's storm water infrastructure.  Compl. ¶¶ 131, 136(c).  But HUD began to investigate that complaint in April 2018.  *See* Sweeney Decl. ¶ 12.  As a result, Texas Housers conceded at the hearing that, to the extent that HUD's failure to investigate that complaint constituted a standalone APA claim, the claim is now moot.  *See* Hr'g Tr. 60:4–61:17.  Similarly, Texas Housers conceded that any standalone allegation under the APA that HUD's decision to enter into what Texas Housers contends was an insufficiently-demanding voluntary compliance agreement is also moot.  *See* Hr'g Tr. 61:19–62:14.

*Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1275 (D.C. Cir. 2007). The first category covers situations in which "the challenged government action authorized conduct that would otherwise have been illegal." *Id.*; *see also Clark Cty., Nev. v. F.A.A.*, 522 F.3d 437, 440 (D.C. Cir. 2008) (finding redressability where a contrary decision by an agency would prevent third-party construction to which the plaintiff objected). The second category covers situations "where the record presented substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress." *Renal Physicians Ass'n.* 489 F.3d at 1275 (quoting *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 941 (D.C. Cir. 2004), *abrogated on other grounds by Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017)).[3] In either case, the Circuit held, "to establish redressability at the pleading stage, [it] required more than a bald allegation; [it] required that the facts alleged be sufficient to demonstrate a substantial likelihood that the third party directly injuring the plaintiff would cease doing so as a result of the relief the plaintiff sought." *Id.*

Even assuming it suffered a sufficient injury, Texas Housers still lacks standing because it has failed to adequately plead that those injuries are redressable. As discussed above, a plaintiff whose theory of redressability requires the subsequent action of a third party faces a considerably tougher row to hoe. *Lujan*, 504 U.S. at 562. Although Texas Housers has asked

---

[3] Although it does not explicitly say so, Texas Housers' theory of redressability falls in the second category. While the complaint alleges that both Houston and HUD are engaging in unlawful conduct, it does not seek a change in any law or regulation that would render illegal what is currently legal. *See Nat'l Wrestling*, 366 F.3d at 940. Moreover, as Texas Housers acknowledges, Houston is presumably free to reject federal housing funds and their attendant conditions. *See* MTD at 26; Opp'n at 26.

this Court to compel HUD to act, the harm it seeks to remedy flows more directly from *Houston's* alleged inaction. For example, according to the complaint:

> As a result of HUD's prolonged failure or refusal to insist on compliance by Houston, the city remains the most segregated cities in Texas, and one of the most segregated large cities in the United States. That persistent segregation operates as a substantial barrier to fair housing choice and equitable distribution of infrastructure and community development resources, which makes it more difficult for Texas Housers to accomplish its mission in Houston.

Compl. ¶ 126. The complaint is replete with other examples. *E.g.*, *id.* ¶ 16 ("HUD has refused to use its immense leverage under federal funding programs to ensure adequate desegregated housing in Houston."); *id.* ¶ 40 ("[HUD] has refused to take effective actions to compel Houston to adjust its housing policies and practices" through administration of federally financed housing programs); *id.* ¶ 42 (pleading that, despite knowing of Houston's violations, "HUD has done nothing about it"); *id.* ¶ 69 ("HUD let Houston off with a slap on the wrist that will do nothing to change Houston's conduct"); *id.* ¶ 132 ("HUD has demonstrated that, absent injunctive relief, it will not conform its conduct to its own obligations under federal law, and will not require Houston to meet the obligations that come as a consequence of accepting federal housing funds."). Indeed, the injunctive relief Texas Housers seeks further buttresses the indirect nature of the harm of which it complains:

> (b) issue temporary and permanent injunctions requiring HUD to enforce Title VI, AFFH, and related obligations against Houston, to withhold further disbursements of . . . HUD funding to Houston until such time as it comes into compliance with those obligations . . . ;

> (c) direct HUD to take all affirmative steps necessary to remedy the effects of the illegal conduct described herein and to prevent similar occurrences in the future.

*Id.*, Prayer for Relief at 36. In sum, Texas Housers' theory of harm relies on HUD as an instrument for altering Houston's behavior. *See* Opp'n at 13 (observing that for Texas Housers to "carry out [its] mission effectively, it needs HUD to be a willing partner").[4]

Texas Housers has not plausibly alleged that relief from the Court would redress these harms. *National Wrestling* is instructive. In that case, the plaintiffs challenged an interpretive rule that the Department of Education issued that outlined a three-part test to assess "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." 366 F.3d at 934 (alteration in original) (quoting 34 C.F.R. § 106.41(c)(1)). The plaintiffs alleged that they were hurt indirectly by institutions that chose "to eliminate or reduce the size of men's wrestling teams." *Id.* at 937. The court found that the plaintiffs had failed to show that the relevant institutions would behave any differently if the court ruled in their favor. *Id.* at 940 ("[N]othing but speculation suggests that schools would act any differently than they do with the Three-Part Test in place."). Similarly, Texas Housers has pleaded no facts that allow the Court to reasonably infer that Houston would act differently in

---

[4] Texas Housers argues in passing that "[a] plaintiff asserting procedural injury never has to prove that if he had received the procedure the substantive result would have been altered." Opp'n at 26 (quoting *City of Dania Beach, Fla. v. F.A.A.*, 485 F.3d 1181, 1186 (D.C. Circ. 2007)). But, as Defendants correctly point out, these cases are inapposite because Texas Housers has not alleged a procedural injury. Reply at 9; *see generally* Compl. Additionally, to the extent that Texas Housers now seeks to characterize its allegations about HUD's failure to investigate as procedural, it conceded at the hearing that they are moot. *See* Hr'g Tr. 60:4–61:17, 61:19–62:14. The Supreme Court has instructed that "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

some way in the face of additional scrutiny from HUD.[5]  Texas Housers' own arguments in

favor of redressability reflect the speculative nature of its theory of relief:

> Were HUD to carry out its legal obligations—or this Court to order it to begin
> doing so—that would directly benefit Texas Housers *by removing an impediment*
> (long-standing municipal interference with efforts at desegregation) to its ability
> to accomplish its mission. . . . Likewise, if HUD were ordered to condition
> Houston's continued receipt of HUD funding on the city's demonstrating actual
> compliance with the law, the result would be *to make it far easier* for Texas
> Housers to advocate for affordable housing in high-opportunity neighborhoods.

Opp'n at 25 (emphasis added); *see also id.* at 27 (arguing that HUD's failure to "make Houston

comply with civil rights laws and advance [affordable housing] projects" is an "impediment to

Texas Housers' ability to accomplish its mission," the removal of which "is a tangible benefit,

regardless of what occurs thereafter").  This is precisely the kind of conjecture that the D.C.

Circuit rejected in *National Wrestling*.  *See* 366 F.3d at 939 (concluding that "a quest for ill-

defined 'better odds' is not close to what is required to satisfy the redressability prong of Article

III") (quoting oral argument).[6]  By contrast, plaintiffs who have successfully pleaded contingent

relief have supported their allegations with "substantial evidence" that left "little doubt as to

causation and the likelihood of redress."  *Renal Physicians*, 489 F.3d at 1275 (quoting *Nat'l*

---

[5] Texas Housers dismisses Defendants' "unsupported (and far-fetched) hypothesis that Houston *could* reject . . . federal funding in the future to avoid civil rights compliance."  Opp'n at 26 (emphasis in original).  But Defendants do not bear the burden here; Texas Housers does.  *Lujan*, 504 U.S. at 561.

[6] Indeed, it is not even clear what Texas Housers would like the Court to do other than to order HUD to more effectively enforce certain laws against Houston.  *See generally* Compl., Prayer for Relief at 36; Opp'n at 35 (asking the Court "to order HUD to end its policy of overlooking Houston's proven failures and to do *something* in accordance with the agency's own findings").  And as Defendants correctly point out, the Supreme Court's decision in *Heckler v. Chaney* generally precludes judicial review of an agency's discrete enforcement decisions.  MTD at 30; *Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion.").

*Wrestling*, 366 F.3d at 941); *see also Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 307–310 (D.C. Cir. 2001) (plaintiff introduced record evidence to support his claim that cities and organizations followed the government's lead); *Block v. Meese*, 793 F.2d 1303, 1308 (D.C. Cir. 1986) (plaintiff supported his "otherwise conclusory allegation" that a government classification was causing lost film sales by including "affidavits of potential customers").

## V.      Conclusion

For all these reasons, in a separate order, Defendant's Motion to Dismiss, ECF No. 13, will be granted and the Court will dismiss the complaint, ECF No. 1, for lack of subject-matter jurisdiction.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: December 3, 2019